STEPTOE, JUDGE:
In each of these cases the claimant seeks an award from the Division of Highways (hereinafter the “State”), alleging that the State was negligent in the design, construction, and maintenance of the intersection, in Gilmer County, West Virginia, of two public roads, U.S. Route 33 and W. Va. 47, and that as a result of the State’s negligence, Okey Lowther was killed in a two-car collision, and his sister, Dora Talbott, received permanent injuries.
The Court ordered that the two cases be consolidated for hearing, which began on the 6th day of April, 1999, at Flatwoods, West Virginia, on the issue of liability only.
U.S. 33, broadly speaking, is a road which runs north and south in West Virginia, and W.Va. 47 runs east and west. The easterly end of W.Va. 47 is U.S. 33 so neither road crosses the other, and their meeting place might be termed a “T” intersection.
The intersection is in a rural area, but there are a country market and a filling station on the easterly side. U.S. 33 is the right of way road, with the pavement being 26 feet wide with a good base and shoulders and is asphalt covered with a double yellow line designating the middle of the paved area. W.Va. 47 is asphalt covered but is less wide.
The opening of W.Va. 47 into U.S. 33 is spacious, the intersection having been redesigned and reconstructed in 1983.
The accident took place at about 2:35 p.m. on Tuesday, the 22nd day of November, 1990. The pavements were slightly wet, but there was no evidence that *56 water on the surfaces of the roads was a factor in producing the collision. The air was clear except for a light rain; no other vehicles were involved in the accident.
The 1989 Pontiac LeMans, owned and operated by Mr. Lowther, and also occupied by Mrs. Talbott, who was seated on the right side of the front seat, had been approaching from the west, and the driver intended, upon entering the intersection, to make.a left turn into the northbound traffic lane of U.S. 33 and to proceed in a northerly direction towards Weston, their destination. The evidence preponderates that Mr. Lowther stopped where he was supposed to stop, near a “stop sign” in the southwest quadrant of the intersection, which was intended to bring eastbound drivers to a stop to look for other vehicles approaching the intersection on U.S. 33, from each direction, before entering the intersection.
At about the same time a 1975 Chevrolet Camaro, owned and operated by Charles K. Paxson (hereinafter “Paxson”), was proceeding southwardly on U.S. 33 at a speed of or slightly less than the posted speed limit of 55 miles per hour. His front seat passenger was his wife, and their infant daughter was in the back seat, well secured. He was not required by traffic signs to reduce his speed in the intersection.
There were no known eyewitnesses to the accident except for the drivers and the occupants of the two vehicles.
Shortly after the collision, Senior Trooper Michael Robinson, of the West Virginia State Police, arrived on the scene and became the investigating officer. The two damaged vehicles then were in the positions in which they had come to rest after the collision, and the Trooper was able to trace the movements of the two vehicles between the place of collision and the places at which each came to rest. He was also able to identify the point of impact of the two vehicles by some gouge marks in the surface of the road in the intersection, in the southbound traffic lane, probably near the center. He inspected the Lowther vehicle and determined that the point of initial impact was the left front of the vehicle; the point of initial impact of the Paxson vehicle was its front.
Neither driver was cited by Trooper Robinson, who, however, was not satisfied with Mr, Paxson’s statement that immediately before the accident he, Mr. Paxson, was driving between 50 and 55 miles per hour, and he later asked for the assistance and advice of an accident reconstructionist, Trooper Leonard Miller, a trained and qualified accident reconstructionist with three years experience, who testified at the hearing as an expert witness.
Trooper Miller, at some time before or after making his investigation at the scene of the accident, had an opportunity to examine the damaged Paxson car (the Lowther car was not available), and upon the basis of the measurements of its damaged sections, to give a professional opinion that at the time of its collision with the Lowther car, the speed of the Paxson car “could not have exceeded the posted 55 mile an hour *57 speed limit.”
Early in May 1991, Trooper Miller and Trooper Robinson met at the scene of the accident and made measurements of sight distances, from the point at the intersection at which drivers intending to enter U.S. 33 from W.Va. 47 actually stopped to determine whether any vehicles were approaching the intersection, on U.S. 33, from the north or from the south, and when it might be safe to enter U.S. 33. One trooper seated himself in his cruiser (#1), at that point, while the other trooper took his cruiser (#2), to a position on U.S. 33 north of the high point on a vertical curve in the surface of the pavement of U.S. 33, a position which was out of sight of the trooper in cruiser #1; then cruiser #2 was driven slowly southbound until the bank of lights on the roof of cruiser #2 was visible to the trooper in cruiser # 1, and the point of first visibility was determined to be 447.50 feet from the trooper in cruiser #1; cruiser #2 was driven southward and downward until its wheels were visible on the pavement; Trooper Miller cautioned, however, that the sight distance between the Lowther car and the Paxson car when the Paxson car first became partially visible to Mr. Lowther on the day of the accident would be a little less than 447.50 feet because of the bank of lights on top of cruiser #2, and opined, as did Lance Robson, hereinafter identified, the sight distance of Mr. Lowther was probably 430 feet.
Trooper Miller also measured the distance between the point at which the Lowther car was probably brought to a dead stop before entering U.S. 33, and the point of collision of the two cars on U.S. 33, and found said distance to be 38.33 feet; and he testified that it would have taken Mr. Lowther 1.9 seconds to go that distance from a dead stop, not counting reaction time.
Lance Robson, a registered professional civil engineer, from Lancaster, Pennsylvania, called by the claimants, and qualified before the Court as an expert in the fields of highway construction design and of accident reconstruction, visited the scene of the accident on December 6, 1993, and at the hearing of this case he testified that the area of U.S. 33 hereinbefore described as the vertical curve north ofthe intersection, but which he said should be called a vertical crest curve, was “a little bit lower or pretty much just on” the specification of the construction plans of 1982 ... and “The worst I found was that at one point it was a hundredth of a foot higher, so I concluded that the road had been built in accordance with the plans.” Mr. Robson used a photograph which he took probably on December 6,1993, from a point at the intersection northward where he testified drivers intending to enter U.S. 33 from W.Va. 47 would stop before entering U.S. 33, to look for approaching traffic on U.S. 33, northward toward the vertical curve on U.S. 33. He testified that the camera lens height was 3'6" from ground level, and that he saw the roof of a car at the vertical crest curve which was four feet, six inches above ground level, and that the sight distance between the two points was 430 feet.
*58 Mr. Robson explained that his investigation and survey of the intersection led him to the conclusion that the intersection had been constructed in accordance with the plans and specifications as provided by respondent to the construction contractor. He noted that the plans contain a note stating that the “design speed” was 40 miles per hour. At the scene he noted that the posted speed limit was 55 mile per hour. This appeared to be inconsistent to him so he took his measurements for determining the sight distance for the driver entering the intersection from W.Va. 47 and looking left for oncoming traffic approaching from the north on U.S. 33 in order to determine if the sight distance was sufficient if oncoming traffic was approaching at the posted speed limit. It is his opinion that the intersection should have been designed for a speed greater than the posted speed limit, and since it was not constructed based upon that criterion, the sight distance at this intersection “is inadequate for the operating speed by a substantial amount.” After explaining that Mr. Lowther was at the “point of no return” in his decision-making process of making the left turn onto U.S. 33, Mr. Robson opined that the design criterion at 40 miles per hour was the wrong criterion and it should have been designed based upon 60 miles per hour, and since the intersection was already constructed, the cure for the problem would be additional signs to warn the drivers approaching the intersection on U.S. 33 at aposted speed of 55 miles per hour or a lower speed, of the proximity of the intersection.
Matthew DiGiulian, a civil engineer employed by the Division of Highways, testified that he received a request from a superior about one year before the hearing of these cases, to review the construction plans for the Linn Intersection work, which was completed about 1988, to see if an adequate sight distance was provided for a driver intending to enter U.S. 33 from W.Va. 47, with particular reference to vehicles approaching from the north on U.S. 33. He determined that the plans provided a sight distance, from the intersection to the top of the vertical curve north of the intersection, of 430 feet, which was sufficient, according to the requirements of the American Association of State Highway and Transportation Officials (AASHTO) Blue Book of 1965 for a road with a speed limit of 40 miles per hour, but insufficient for a road on which the speed limit is 45 miles per hour. He did not go to the site of the accident. When asked about the difference between design speed and posted speed, he said they are different and that different criteria are used for speed limits.
The troopers and Mr. Robson differed as to the time it would have taken Mr. Lowther to clear the southbound lane of U.S. 33 starting from a dead stop where drivers intending to enter make their surveillance of U.S. 33 for other vehicles approaching the intersection from the north or south, Trooper Miller testifying that the time was 1.9 seconds from start-up to instant of collision over a distance of some 38.33 feet, and Mr. Robson putting the time at 4 to 5 seconds (the Court will assume that he would not *59 disagree with 4 !4 seconds).
The question is: How many feet was the Paxson car from the collision point at the instant when Mr. Lowther from a dead stop at the mouth of W.Va. 47, put his car in motion to cross the southbound traffic lane of U.S. 33?
Trooper Miller correctly testified that a vehicle going 60 miles per hour will cover 88 feet in one second (5,280 + 60 = 88).
A mile is by definition 5280 feet, and a car driven at 60 miles per hour will, in one second, go 88 feet (5,280 + 60), as Trooper Miller testified, and a car driven at 55 miles per hour will, in one second, go 80.663 feet (81 feet, as rounded off by Mr. Robson).
The answer lies in a simple calculation of how many feet the Paxson car traveled, at 55 miles per hour, in 4.5 seconds, (4.5 x 80.663 = 362.983 feet, or 363 feet rounded off).
Hence, at 363 feet from the collision point the Paxson car was well within Mr. Lowther’s sight distance of430 feet, from the time Mr. Lowther made his move until the instant of collision.
The Court concludes that Mr. Lowther was negligent in entering U.S. 33 from W. Va. 47 when the Paxson car in the southbound lane was approaching the intersection, and that Mr. Lowther’s negligence was the proximate cause of the accident in which Mr. Lowther was killed and Mrs. Talbott was injured.
Claimants, however, without conceding that Mr. Lowther’s negligence was the proximate cause of the accident, contend that the State was negligent and that its negligence was the proximate cause, or a proximate cause of the accident resulting in the death of Mr. Lowther and in the injuries sustained by Dora Talbott.
Specifically, each claimant makes the following allegations:
1. The West Virginia Department of Highways owed to the said Dora Talbott and Okey Lowther and to other members of the traveling public a duty to design, construct and maintain the highway in such manner so as to protect the said Dora Talbott and Okey Lowther and the traveling public against unreasonable risk of injury.
The said intersection ofU.S. Route 33/119 and U.S. Route 47 was negligently and carelessly designed, constructed and maintained by the West Virginia Department of Highways in such a maimer as to require a vehicle, traveling east on Route 47 such as were the said Dora Talbott and Okey Lowther, to enter Route 33/119 at such a degree and angle so as to create an unreasonable risk and safety hazard and prevent a motorist from having sufficient visibility distances to enter the said roadway in a safe fashion.
The said design, construction and maintenance of the intersection by The West Virginia Department of Highways negligently created such appurtenances and environmental barriers which unreasonably and dangerously inhibited the sight distances *60 needed to safely enter into the intersection and unreasonably inhibited the free flow of roadway traffic.
2. The West Virginia Department of Highways owed a duty to the said Dora T albott and to Okey Lowther and to other members of the traveling public for the proper and safe placement and operation of traffic control signals at the intersection of U.S. Route 47 and U.S. Route 33/119.
3. At the time of the collision, The West Virginia Department of Highways negligently and carelessly failed to place and maintain adequate traffic control signs at the intersection on U.S. Route 33/119 and U.S. Route 47.
4. At the time of the collision, the West Virginia Department of Highways, was aware and had knowledge that numerous other automobile accidents had occurred at the said intersection since its design, construction and completion and the West Virginia Department of Highways negligently and carelessly failed at any time to take corrective action to prevent further such automobile accidents from occurring.
5. The West Virginia Department of Highways further negligently and carelessly failed to place and maintain adequate warning signs about that roadway surface upon which the vehicle in which the said Dora Talbott and Okey Lowther and other motorists traveled that the roadway may be adversely affected when subject to certain weather conditions.
The allegations will be addressed, seriatim:
1. Appurtenances and environmental barriers were created by the State in the design, construction and maintenance of the intersection of U.S. 33 and W.Va. 47 and the approach of U.S. 33 to the intersection.
No evidence was submitted at the hearing to support this allegation, and the Court finds as a matter of fact that the State was not negligent as alleged, in this respect.
2. The State failed to install and maintain a traffic control signal at the intersection. Charles Raymond Lewis, II, a registered professional engineer of the Traffic Engineering Division of the Division of Highways, who had been so employed since 1971, testified that, “By definition, a traffic signal is a traffic control device that alternately assigns the right of way. It’s an electrical device that alternately assigns the right of way.”
Mr. Lewis opposed placement of a traffic control signal at the intersection, because the intersection seemed to operate very well without it. Had he thought there was enough traffic to justify consideration of such a signal, he testified, he would have consulted the Manual on Uniform Traffic Control Devices (MUTCD) to determine if a traffic control signal should be placed at the intersection. The Manual, he testified, sets forth criteria for the signal, called warrants, and if a signal is proposed, it must have sufficient warrants, and if a signal is in place and does not have sufficient warrants, the *61 signal should be removed. Mr. Lewis testified that a signal for the Linn Intersection did not have enough warrants - “it wasn’t close”. The Court finds as a matter of fact that the State was not negligent in failing to place and maintain a traffic control signal at the intersection. See Gibson v. Division of Highways, 19 Ct.Cl. 206 (1993).
3. The State failed to place and maintain adequate traffic control signs at the intersection of U.S. 33 and W.Va. 47, and their approaches.
The evidence adduced at the hearing on these complaints indicates that the State, on the date of the accident, was in compliance with the 1978 MUTCD and with the State’s own design guide.
Mr. Lewis, testified that there are three types of traffic control signs on public roads:
a) regulatory signs;
b) warning signs; and
c) guide signs
The first sign on U.S. 33 that Paxson would have seen was a notice that the driver is approaching a junction with W.Va. 47;
The second sign on U.S. 33 that Paxson would have seen was a 7 14 foot by 2 14 foot guide sign, a green and white assembly giving major destinations, in this case Glenville on U.S. 33 and Burnt House on W.Va. 47; and
The last sign, called a Final Turn Assembly, was a guide sign, and informed the approaching driver in which lane he should be if intending to continue on U.S. 33, and which lane he should take if intending to leave U.S. 33 and to turn right onto W.Va. 47.
Mr. Lewis also testified as to traffic signs in place on W.Va. 47, immediately before the accident, notifying a driver driving from the west that he was approaching U.S. 33.
a) the first sign was an assembly sign of ajunction ahead with U.S. 33 (and U.S. 119), and that W.Va. 47 would end at that junction;
b) the second sign was a 7 14 foot by 2 14 foot green and white guide sign informing the driver approaching from the west that at the end of W.Va. 47, if he wished to go toward Weston, he should make a left turn on U.S. 33, and if he wished to go to Glenville, he should make a right turn into U.S. 33;
c) the third sign was a stop sign, informing the driver approaching U.S. 33 from the west that he must stop and that traffic already on U.S. 33 has the right of way and that he does not have the right of way; and
d) the fourth sign was a final turn assembly sign, indicating to drivers on W.Va. 47 the number designations of roads available to him at the intersection and what direction to follow.
All seven of the foregoing signs were guide signs except the stop sign, which *62 was classified as a regulatory sign. There were no warning signs, the State’s position having been that the described traffic control signs on U.S. 33 and W.Va. 47 were sufficient to notify approaching drivers of the imminence of the intersection. Mr. Lewis testified that at one time the MUTCD provided for a limited sight distance sign, but it was taken out of the Manual (a singular event in Mr. Lewis’ memory) and, to the best of his knowledge it was because the public did not understand it.
The Court finds as a matter of fact that the State erected and maintained signs on the approaches to the intersection on U.S. 33 and W.Va. 47; and that its failure or refusal to erect a special “limited sight distance” on U.S. 33 to warn southbound drivers was not a negligent act. See Gibson v. Division of Highways, Id.
4. The State failed, while on notice of an elevated number of accidents at the intersection, to take corrective action to prevent such accidents from occurring.
Claimants rely upon records of the State of reports of motor vehicle accidents at this intersection (at point designated as 26.86, a mile post). Mr. Lewis testified as to two reports in the record designated as Claimants’ Exhibit No. 10, and read the kinds of engineering data provided in the reports.
The first report of accidents, covering the period from October 1, 1983 to October 31, 1986, in which there were ten listed accidents, is as follows:
Linn Intersection Accidents
10/1/83 -10/31/86
[[Image here]]
*63 [[Image here]]
*64 [[Image here]]
*65 [[Image here]]
In an internal working memorandum, an intersection safety study, prepared by Mr. Lewis for his management in the Traffic Engineering Division, dated June 2,1988 *66 (Claimants’ Exhibit No. 12), he reported on his inspection of the Linn Intersection on May 24, 1988, that:
“During the three-year data period there were six accidents at the intersection for a rate of 3.37 accidents per million entering the intersection. Five of the six accidents were ‘at angle’ and one involved a left turn. There was no consistency or pattern to the ‘at angle’ accidents.
“A field review of the intersection on May 24, 1988, revealed only minor deficiencies. The length of the stop bar on WV 47 is not adequate and the centerline on WV 47 is worn out at the intersection. The stop bar should be extended and the centerline possibly installed with lane tape.
“The intersection is on a crest and drivers exiting WV 47 cannot see the pavement to the east [north] on US 33. Sight distance to approaching vehicles is adequate. Other than renewal of the pavement markings as indicated above, no action is recommended.”
The listings of 16 accidents at the intersection on which claimants base their complaint about the high rate of accidents use the rate of accidents as a reason for concluding that it was dangerously and negligently constructed, and maintained, is not supported by the statistics of the Traffic Engineering Division in Claimants’ Exhibit No. 13, which show that of the accidents:
1 case in which the driver changed lanes improperly
8 cases in which the circumstances were unknown
1 case in which the driver hit a tree
1 case in which the accident was attributed to slippery pavement
4 cases in which the drivers did not have the right of way, and
1 case in which the vision of each driver was obstructed (this case)
The Court finds as a matter of fact that the statistics on the accidents at the intersection from October 1, 1983 to January 22,1990, do not prove that before January 22, 1990, the Linn Intersection was dangerously and negligently designed, constructed and maintained, and that the State was not negligent in failing to correct alleged errors.
5. The State failed to advise, by signs along U.S. 33 and W.Va. 47 in the vicinity of the Linn Intersection, that weather conditions might affect motorists adversely. There is no evidence that water on the surface of the roads in the intersection was a causative factor in the accident.
As to the claimants’ allegation (which was not made in their respective complaints or in any amended complaints) that respondent was negligent in the design of the intersection, based upon the fact that the intersection was designed for a 40 miles per hour speed but was posted for a speed limit of 55 miles per hour, the Court has determined that design speed does not control the posting of a speed limit. According *67 to Mr. Lewis, design speed is a number to provide certain parameters to be met for putting the road together, i.e., providing a set of criteria for the geometric design of the highway. On the other hand, setting the speed limit is a regulatory function for the Commissioner of Highways. The Commissioner bases this decision for the speed limit upon recommendations made by traffic engineering technicians who have analyzed data collected in the field. It is not unusual in West Virginia for the speed limit to exceed the design speed, and design speed, in most cases, is not known to the traveling public.
The Court finds that the State was not negligent in posting a speed limit of 55 miles per hour for U.S. 33 at this area notwithstanding the fact that the plans denote a design speed of 40 miles per hour in the area.
The Court also finds as a matter of fact that the sole cause of the death of Okey Lowther and of the injuries sustained by Dora Talbott was the negligence of Okey Lowther in entering U.S. 33 in the face of oncoming traffic having the right of way.
The Court also finds as a matter of. fact that the State was not guilty of any negligence proximately causing, in whole or in part, the death of Okey Lowther and the injuries sustained by Dora Talbott.
The Court makes no award to Beulah Burkhammer, as Executrix of the Estate of Okey Lowther.
The Court makes no award to Dora Talbott.
Claims disallowed.